IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MIANNA C. FORRESTER,

         Plaintiff,

vs.

METROPOLITAN LIFE INS. CO., and
RAYTHEON COMPANY,

         Defendants.

Case No. 04-1204-JTM

MEMORANDUM AND ORDER

      This is an action by former Raytheon employee Mianna Forrester alleging that defendants violated their obligations under ERISA in the denial of her claim for long-term disability benefits. Both parties have filed motions for summary judgment. For the reasons stated herein, the court hereby grants the summary judgment motion of the defendants.

      Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

      In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come

forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Plaintiff Mianna C. Forrester was a participant in the Raytheon Company Employee Group Long-Term Disability Plan (the "Plan"), which is funded by a group policy of long-term disability insurance issued by MetLife to Raytheon. Raytheon is the Plan Administrator. MetLife is the Claims Administrator, responsible for processing claims and deciding appeals from denials of claims.

The Plan confers discretionary authority on the Plan Administrator and other Plan fiduciaries, stating: In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

> The Plan provides the following definition of "Disability" applicable to plaintiff's claims: "Disability" or "Disabled" means that, due to an Injury or a Sickness, you require the regular care and attendance of a Doctor and:

>1.  During the first fifteen months, including your Elimination Period, you are unable to perform each of the material duties of your regular job;…

(R. 10).

Forrester was employed as a Senior Administrative Associate for Raytheon Company. Her last day of work for Raytheon was May 6, 2003.

On August 4, 2003, Raytheon forwarded to MetLife Forrester's Application for Disability Benefits and other documents, including an Employer Statement of Job Demands and Forrester's job description.

Plaintiff signed the "Statement of Employee" portion of the Application for Disability Benefits on July 25, 2003 and her attending physician, Steven Garner, M.D., signed the physician's portion of the application on July 28, 2003. Dr. Garner listed Forrester's diagnoses as Chronic Fatigue Syndrome, Myalgia, and Bipolar Disorder. In noting Forrester's functional capacities, Dr. Garner stated that she could drive and use public transportation occasionally, walk, stand and change position occasionally, sit frequently and never perform activities such as climbing, balancing, bending/stooping/squatting, pushing/pulling/twisting arm and leg controls, operating heavy equipment or electrical equipment or performing activities requiring concentrated visual attention. Dr. Garner stated that Forrester was totally disabled for her occupation and for any occupation, and that he thought Forrester could resume work activities "hopefully in 2-3 mos.," around October 2003.

(R. 244).

On the same day that he signed Forrester's application, July 28, 2003, Dr. Garner issued a "To Whom It May Concern" letter which was submitted to Met Life, which stated:

> So far, our treatment plan has not been successful, and subsequently her severe symptoms still preclude her from returning to her current employment position. She is significantly limited in her daily routine, and, while not homebound, she experiences severe pain, fatigue, and weakness with even minimal activity at home. Our working diagnoses are Chronic Fatigue Syndrome, Myalgia, and Bipolar Disorder. However, it is noted that all of her symptoms began rather abruptly and were preceded by a period of persisting fevers for which we were never able to determine a clear etiology. It was after evaluation by a local infectious disease expert

3

> that the diagnosis of chronic fatigue syndrome was made. However, given the presentation, I am suspicious that there may be other underlying pathology contributing to her condition, and therefore, we have arranged for Mrs. Forrester to see a rheumatologist in the very near future.

(R. 201.)

Forrester's claim, including Dr. Garner's July 28 letter, was reviewed by a MetLife nurse consultant. The nurse consultant contacted Forrester's supervisor concerning her job duties, and summarized that conversation in a diary note of August 12, 2003. Forrester's supervisor explained that Forrester's job was sedentary in nature, "desk work only, not physical, office setting." (R. 43).

On August 12, 2003, the nurse consultant also wrote Dr. Garner, requesting all office notes from May 2003 to the present and enclosing a questionnaire and mental status examination form to be completed by Dr. Garner. Dr. Garner completed and returned the forms. (R. 287-291).

In response to the questionnaire, Dr. Garner listed Forrester's present diagnoses as chronic fatigue syndrome, myalgia and bipolar disorder. With respect to her physical exam findings, he stated:

> Current physical findings are mostly normal, except for moderate muscle & joint pain. She does exhibit clinic depressive symptoms of mood swings consistent with Bipolar Disorder. Major limiting factor is subjective symptoms of pain & extreme fatigue.

(R. 287). When asked about recommended work restrictions, Dr. Garner stated: "Currently, total work restriction. Hopefully she may be able to return to partial duty within 1-2 months." (R. 288).

On the Mental Status Examination (R. 289-291), Dr. Garner described Forrester's appearance as normal, her behavior and psychomotor activity as appropriate, and her attitude toward the examiner as normal. He described her mood as "min. dysthymic," her affect as "somewhat flat," and her appropriateness as normal. He described her speech as normal, did not note any perceptual disturbances, and stated that her thought process seemed intact, no abnormality was noted in content of thought, she was alert and oriented, her short-term and long-term memory were all intact, concentration and attention were appropriate, no deficits were noted in capacity to read and write, abstract thinking was intact, and fund of information and intelligence was normal. He also observed

that Forrester's impulse control was normal, judgment and insight both seemed appropriate, and reliability was normal. With respect to functional deficits, he noted that her activities of daily living were significantly limited primarily due to extreme fatigue and muscle pain and that "mood symptoms pose only minimal limitation here." (R. 291). He felt that her social function was severely limited due to both fatigue and mood symptoms, and he stated that Forrester was not able to complete minimum activities of daily living because of symptoms and that return to the workplace was not attempted because of severe symptoms. Summarizing his evaluation, he stated: "Mood symptoms are an aggravating factor, but extreme fatigue and myalgia seem to pose majority of the problem." (R. 291).

The nurse consultant conducted a telephone interview with Forrester on August 13, 2003, and received and reviewed Dr. Garner's medical records. Those records reflect the following:

- Forrester saw Dr. Garner on May 1, 2003 "primarily for concerns about persisting systems of fever" (R. 271); Dr. Garner prescribed antibiotics and ordered lab tests, which were generally negative, saw her again on May 7, 2003, and referred her to an infectious disease specialist, Dr. Goodpasture. Forrester made several calls to Dr. Garner's office in May and saw him again on May 23, 2003 and May 28, 2003.

- On Forrester's office visit of June 19, 2003, for a follow-up after her appointment with Dr. Goodpasture, Dr. Garner noted that her evaluation had essentially returned to normal, and that Dr. Goodpasture felt she probably was actually suffering from chronic fatigue syndrome. Dr. Garner noted that he had previously diagnosed bipolar disorder and he had prescribed Zyprexa, which Forrester had taken for a brief time, during which her husband felt that she had shown some improvement. Dr. Garner's diagnoses on this visit were chronic fatigue syndrome and bipolar disorder. He felt that Forrester should not return to work for at least the next month, at which point he would reevaluate and "hopefully she will be doing better to where she will be returning to her occupation." (R. 282).

- Forrester saw Dr. Garner again on July 22, 2003, and he stated "it appears that the bipolar disorder is improved slightly, but the chronic fatigue and fibromyalgia are still giving her quite a bit of problem." (R. 283). Dr. Garner referred Forrester to Dr. Levy, a rheumatologist.

- At Forrester's office visit of July 28, 2003, her husband stated that he continued to notice improvement in a lot of the mood swings she was experiencing, since she was taking Zyprexa. Forrester continued to report pain, weakness and limitation. Dr. Garner discussed "current disability issues" with Forrester and told her that "at this point it is my opinion that her problems still preclude her from returning to her job" and that he would "make sure to take care of the necessary paper work to go with this." (R. 285).

MetLife had Forrester's claim reviewed by two independent physician consultants, Bettina B. Kilburn, M.D., a psychiatrist, and Tracey Schmidt, M.D., Board Certified in Internal Medicine and Rheumatology.

Bettina B. Kilburn, M.D., provided a medical opinion to MetLife on August 28, 2003, based on Dr. Garner's medical records and a telephone conversation she had with Dr. Garner. Dr. Kilburn's report summarized her review of Forrester's records and her telephone review with Dr. Garner. She stated:

> On 8/27/03, I completed a telephonic review with AP Dr. Garner. Dr. Garner stated that he based the claimant's diagnosis of Bipolar Disorder on her history of depression alternating with irritation/agitation. He stated that the claimant has responded to Zyprexa, currently five mg q. d., with significant diminution in her mood swings; the claimant's husband has also verified this. Dr. Garner has discussed with the claimant referring her to a psychiatrist, but stated that the claimant's psychiatric complaints are not her primary issue. In addition, the claimant is currently reluctant to see a psychiatrist. Dr. Garner stated that the claimant's mood symptoms are *"clearly secondary, not really limiting her function, although her chronic fatigue syndrome aggravates her depressive mood swings."*

(R. 196) (Emphasis in original).

To the question, "Does the medical documentation support compelling evidence of a significant, measurable, psychiatric impairment that would support the inability to work?," Dr. Kilburn wrote:

> No. The available clinical documentation indicates that the claimant's objective Mental Status Exam findings are essentially within normal limits, except for some mild mood disturbance, which does not appreciably limit the claimant's function. According to the documentation and the telephonic information provided by the claimant's AP, the claimant's mood swings do not impair her; also, the claimant's mood swings have significantly diminished on low-dose Zyprexa. As per the claimant's AP, the claimant is primarily limited by her selfreported complaints of severe fatigue and myalgia, for which medical IPC evaluation would assist in clarifying, both diagnostically and functionally.

(R. 196-197.)

Tracey Schmidt, M.D., reviewed Forrester's medical records for MetLife on September 4, 2003, and provided an opinion. She wrote that the "File lacks sufficient medical to support objective evidence of a physical functional capacity impairment to a full-time sedentary position." (R. 198). Dr. Schmidt noted that fibromyalgia/CFS is a diagnosis of exclusion and a constellation of symptoms consisting of fatigue, pain, difficulty with memory and concentration, poor sleep and tender points on exam. She observed:

> File mentioned subjective complaints of fatigue and joint pain, but file lacks any laboratory workup including, RA, ESR, ANA, TSH, CPK, etc. File lacks any notes from rheumatology. File lacks any sleep studies as the workup for fatigue.

She noted that a high percentage of fibromyalgia patients have an underlying psychiatric disorder and that while Forrester's records mentioned a history of bipolar disorder and depression, they lacked any notes from any mental nervous health care providers.

She also observed:

> File lacks mention of what specific ADLs claimant cannot perform by Dr. Garner, as well as there is no mention of need for home health aide that would support an impairment from a sedentary position. File mentions persistent fevers and night sweats that resolve but file contains only one recorded elevated temperature of 100.3 on 5/1/03. CXR was reported normal. Apparently CT scan of liver/pancreas was done but file does not contain this report. Physical exams are reported to be essentially normal. There was no evidence of synovitis or restricted ROM of joints. The American College of Rheumatology requires 11 out of 18 tender points on exam to be present in order to meet the criteria to make the diagnosis of fibromyalgia and it is unclear if these were present.

She noted that the mainstream treatment for fibromyalgia is exercise and low dose antidepressants but the file did not show that Forrester was actively participating in a clinically structured exercise program. She concluded: "Dr. Garner wrote on 8/14/03 that claimant's major

limiting factor is subjective complaints of pain and fatigue. Dr. Garner's office was contacted today to obtain any objective information but no call was received as of 6:00 p.m. tonight." (R. 193-194).

Plaintiff argues that Dr. Schmidt failed to take account of whether her condition would permit her to walk the five and a half hours her job demanded. But this argument is premised on a misreading of the evidence, specifically, the "Employer Statement of Job Demands," which includes the statement that Forrester's position required "frequent" walking, and defined "walking" as "$\leq 5$ ½ hrs. or 34-66%." But the uncontroverted evidence from Forrester's supervisor, which is not controverted by the plaintiff, is that Forrester's actual work was sedentary "desk work only, not physical, office setting." (R. 43). In her appeal of her denial of claim, Forrester did not argue that her job required 5 ½ hours of walking, or argue that her job was anything other than sedentary.

Plaintiff also emphasizes that in MetLife's file there was information indicating that her husband lives with her, and suggests that he is present and provides a variety of services: "My husband cleans and cooks ... [and] does the shopping and the laundry ...." (R. 45). The evidence does not support plaintiff's suggestion that the file indicated plaintiff's husband could perform all the work traditionally performed by home health aides. The record does not indicate that MetLife provided this information to Dr. Schmidt. In her appeal of her denial of claim, Forrester did not argue that she needed a home health aide, or argue that her husband could perform such a role.

Dr. Schmidt also stated that she reviewed a "letter that came from the VA dated 9/4/03 from a Nancy Hildreth with a copy to Metlife." (R. 200).

Dr. Schmidt later attached to her report the following note:

> 9/9/03 – Spoke with Jody at Dr. Garner's office and apparently patient was seen on 8/22/03 with same subjective complaints of fatigue and pain. Physical exam was essentially unremarkable, no reported muscle weakness. She has not seen Rheumatology yet. There was a letter that came from the VA dated 9/4/03 from a Nancy Hildreth with a copy to Metlife [sic]. Jody thinks it might be from a counselor. This was not in the file when I had reviewed it yet. My opinion has not changed as discussed above.

(R. 200). The VA letter referenced by "Jody" is not contained in the administrative record, and neither Nancy Hildreth nor the VA letter is mentioned in the medical records of Dr. Garner's office.

8

On September 8, 2003, MetLife denied Forrester's claim. The letter stated: "To obtain a clearer picture of the medical information received and of your medical condition, your claim was referred on August 22, 2003 to Independent Physician Consultants, Board Certified in Rheumatology and Psychiatry." It also provided:

> Based on the review of the above information, we have determined that the current medical information contained in your file along with the absence of objective medical evidence does not support a Disability. Therefore, we have no alternative but to disallow your claim for LTD benefits.
>
> In the event a claim has been denied, in whole or in part, you may request a review of the claim in writing. This request for review should be sent to MetLife, PO Box 14592, Lexington, KY 40511-4592, no more than 180 days after you receive notice of denial of the claim. When requesting this review, please state the reason(s) you believe the claim was improperly denied and submit any request to review relevant documents. You may also submit additional medical or vocational information and any facts, data, questions or comments you deem appropriate for us to give your appeal proper consideration.

(R. 180).

The nurse consultant had sent a questionnaire on August 15, 2003 to Dr. Levy, the rheumatologist Forrester was scheduled to see on August 18, 2003, and requested that he complete it at that visit and send Forrester's progress record. On September 24, 2003, MetLife received a call from Dr. Levy's office, advising that Dr. Levy did not do disability forms but that the office would send the office note for Forrester's appointment, which had been rescheduled for September 16, 2003. The office note was faxed to MetLife that day. Dr. Levy's impression was:

> 1. Fibromyalgia with important physical pain. This is compounded by depression and sleep disorder.
> 2. Active depression.
> 3. Sleep disorder, which is probably multifactorial; however, since there is a history of snoring, sleep-disordered breathing needs to be considered.

Dr. Levy recommended medication, water aerobics and referring Forrester for psychotherapy and psychiatric treatment. Dr. Levy also observed that Forrester's depression was very active and could be the reason her fibromyalgia had gotten so symptomatic, and that without resolving the depression, they would not be able to observe any significant improvement of the fibromyalgia. Dr. Levy also

suggested the possibility of referring Forrester to a chronic pain management physician if significant physical pain continued after improvement of Forrester's depression and sleep situation.

After receiving Dr. Levy's report, MetLife sent the report to Dr. Schmidt on October 1, 2003, and asked her to review it and to respond whether it changed her previous opinion. Dr. Schmidt was also asked to have a telephone conference with Dr. Levy to discuss the September 16, 2003 consultation.

Dr. Schmidt responded by attaching another addendum to her original report. She noted that she had placed three calls in an attempt to locate Dr. Levy on October 14, 2003, and received a voice message from him on October 15, 2003 stating that he did not do disability determinations. Dr. Schmidt concluded that Dr. Levy's September 16, 2003 report did not change her opinion, and she noted that no additional blood work, sleep studies or mental nervous health care provider notes had been provided.

On September 30, 2003, MetLife submitted Dr. Schmidt's report to Dr. Garner for comment. Dr. Garner responded with a letter of October 8, 2003, stating that Forrester had seen a rheumatologist, who confirmed the diagnoses of fibromyalgia and major depression, and suggested medication and psychological follow-up, as well as exercise. Dr. Garner now felt that Forrester's mood disorder was "actually more of a major contributing factor to her clinical problems." (R. 308). He stated that he was "optimistic that with appropriate evaluation and treatment regimen we will be able to alleviate a lot of her clinical problems and eventually get her back working without any restriction." (R. 309).

Dr. Schmidt reviewed Dr. Garner's letter and concluded that it had not changed her opinion about Forrester's physical functional capacity. She noted that Dr. Garner had mentioned depression and bipolar disorder and stated that Forrester was seeing a psychiatrist, but Dr. Schmidt had not seen any mental health provider notes and felt that she could not comment on psychiatric issues.

On December 4, 2003, MetLife asked Dr. Schmidt to contact Dr. Garner and discuss his October 8, 2003 letter with him. After several attempts, Dr. Schmidt made contact with Dr. Garner on December 22, 2003, and reported:

> 12/22/03 – Spoke with Dr. Garner and he states that claimant is showing some improvement. He feels it is a combination of a physical and mental impairment from both depression and fibromyalgia. He said she had seen the rheumatologist, Dr. Levy, a few times. He reports that she has subjective complaints of fatigue, depression and myalgia. No new objective findings. She did have a sleep study done which he reported showed some mild OSA and she is getting fit for some device.
> Recommendations: With the additional phone call my opinion has not changed about her physical functional capacity, as stated on my previous reviews.

(R. 267-268).

By letter of January 15, 2004, Forrester's attorney requested a copy of the claim file and an extension of the appeal deadline, which was March 6, 2004. He was advised that the deadline could not be extended, and he submitted an appeal request and another request for the claim file by letter of February 4, 2004. The claim file and Summary Plan Description ("SPD") were sent to Forrester's counsel by letter of February 13, 2004. To accommodate Forrester's request for an extension of time to submit additional information, MetLife agreed to deem Forrester's appeal filed as of March 6, 2004 and to consider any materials Forrester submitted by April 18, 2004.

On April 12, 2004, Forrester's counsel submitted two reports, dated March 11 and March 24, 2004, from Dr. Garner and a report dated April 7, 2004 from a psychologist, David Simmonds, Ph.D. Dr. Garner's report of March 11, 2004, addressed "To Whom It May Concern," stated that Forrester's final diagnoses were significant fibromyalgia, depression and obstructive sleep apnea. The sleep apnea had been diagnosed by a pulmonologist, Dr. Bloxham. Dr. Garner concluded:

> Again, with some degree of difficulty and confusion I feel that we have finally been able to clarify the accurate diagnoses as discussed above and are in the process of attempting to optimize treatment and management of these problems. While the severity of her symptoms has improved somewhat she continues to have significant limitation in function that precludes her from returning to full time work.

(R. 255). Dr. Garner's report of March 24, 2004(R. 253-254 ), addressed to Forrester's attorney, commented on Dr. Kilburn's report, stating that Dr. Kilburn's account of their conversation was accurate but that the diagnosis had changed. Dr. Garner stated:

11

> The majority of her clinical limitations still lies with physical symptoms of pain, stiffness and weakness. However, she continues to have significant clinical problems from her depression. Unfortunately, both of these problems aggravate each other. We have her seeing a psychologist and have been adjusting her antidepressant medications. We are also continuing to adjust her treatment regimen for the fibromyalgia, and she has seen a rheumatologist for this as well. Specifically to address the phone conversation with Dr. Kilburn from 8/2003, I feel that her description was an accurate report of our interview. However, again I feel that this must be considered in view of the fact that both the diagnoses that were mentioned and discussed in that interview were subsequently changed.

(R. 253-254).

Dr. Simmonds' letter of April 7, 2004 to Forrester's counsel stated in part:

> At your request, I am writing a letter describing my assessment of Ms. Forrester's psychiatric condition. I have diagnosed Ms. Forrester as having an Axis I disorder of Mood Disorder secondary to physical problems. Ms. Forrester claims to have both chronic fatigue syndrome and fibromyalgia syndrome, which are the sources of her pain. I would also view her as having a recurrent Major Depressive Disorder of moderate severity. Ms. Forrester claims significant pain problems with her pain ranging at times from 7/10 to 9/10 in intensity.
>
> Ms. Forrester psychiatrically presents with a flat affect and because of that might appear somewhat "odd" in a workplace. She does loosen up over time and show more facial expression. Ms. Forrester has been significantly stressed by her husband's chronic medical conditions which include recent heart-related crises which have necessitated hospitalization as recently as February 2004.
>
> I believe that Ms. Forrester views her ongoing pain and stress as being significant factors which would impair her ability to function appropriately if she were to return to a full time employment situation.
>
> I hope this information is useful to you in your work with our client.

(R. 252).

On April 19, 2004, MetLife advised Forrester's attorney of its need for an additional 45 days to complete its review and stated that it would make its final determination no later than May 30, 2004.

MetLife had Forrester's claim reviewed by Mark Burns, M.D., a rheumatologist, J.W. Rodgers, M.D., Board Certified in Internal Medicine and Pulmonary Medicine, and Lee Becker, M.D., Board Certified in Psychiatry, in order to assist it in determining Forrester's appeal.

Dr. Burns, the rheumatologist, in his report of May 23, 2004, noted that Dr. Levy, Forrester's rheumatologist, had moved out of state seven months ago, and that a call to Dr. Garner had not been returned. Dr. Burns concluded:

> There is no documentation of any damage to joints, muscles, nerves, or other structures that would cause permanent restrictions in the claimant's ability to function. The muscle trigger points represent areas of tight but not damaged or weakened muscles. These painful areas can cause limitations in motion but these limitations are not fixed or necessarily permanent, as the underlying muscle is normal.
>
> The patient has self-reported difficulties with pain and fatigue as well as depression and mood problems. She would need frequent breaks in a work environment, as fibromyalgia will cause patients to stiffen at rest. This forces them to need to move around to loosen up. She would have difficulties with lifting weights > 10 lbs. She would tire easily with repetitive movements of the arms and legs and with repetitive reaching due to easy fatigability of the neck and upper arm muscles due to fibromyalgia, but would still be able to perform these functions. She would not have any physical limitations doing sedentary work, and would be able to use a computer.
>
> A graduated RTW would be appropriate and there are no physical limitations that would prevent RTW now. As noted above, none of the claimant's limitations are due to permanent injury. There is no physical condition that prevents that claimant from performing her job.

(R. 85). Dr. Burns noted that he was not addressing Forrester's psychiatric condition. (R. 85).

> On May 25, 2004, Dr. Burns submitted an addendum to his report, stating:
> I am asked to comment about whether the claimant's ability to do the essential duties of her work was impaired form [sic] 05/07/03 to the present. Based on my review of the records, there were no physical impairments that prevented the patient from working during this time period. The comments that I made in my previous report concerning her ability to RTW now also apply to this time period.

(R. 82). Dr. Burns again noted that he could not comment about the effect of any psychiatric problems on Forrester's ability to work.

Dr. Becker, the psychiatrist, reviewed Forrester's claim and submitted a six-page report. (R. 87-92). After summarizing his review of Forrester's medical records, Dr. Becker summarized his phone conference with Dr. Simmonds, Forrester's psychologist. He noted that Forrester was first seen by Dr. Simmonds on September 24, 2003 and that Dr. Simmonds said he saw Forrester approximately once a month for "primarily supportive therapy and maintenance" and there had not been "intensive cognitive behavioral intervention." He reported that Dr. Simmonds noted there had

13

been no collaboration between himself and Forrester's primary care physician, who he believed might be prescribing psychotropic medication, that he indicated there had been no psychiatric evaluation, although Forrester had been seen in October 2003 by an ARNT who was supervised by a psychiatrist. Continuing his account of his conversation with Dr. Simmonds, Dr. Becker stated:

> Discussion then focused on Mental Status Examination. The Therapist describes that the Claimant presents with a very flat affect. At times she has presented with dysphoric mood and affect. He describes speech may be slow at times and she may have some motoric slowing at times. He indicates that there are no thought process abnormalities, there are no suicidal or homicidal ideations. He indicates there are no abnormalities in cognition, memory or concentration testing on Mental Status Examination. Insight and judgement [sic] are noted to be fair to limited.

(R. 91). Dr. Becker noted Forrester's medications and activities of daily living and his discussion of work planning with Dr. Simmonds and stated:

> Discussion then focused on return to work planning. The Psychologist indicates that the Claimant is applying for Social Security Disability and is not interested in returning to work. He indicates that she sees herself as being disabled. He describes that the primary issue impacting her return to work status is the pain issue and not related to the mood disorder.

(Id.)

Asked to identify the DSM4 diagnosis impairing work when Forrester left work, and whether it changed to appropriately reflect the current DSM4 diagnosis based on clinical evaluation, Dr. Becker responded:

> There appeared to be no DSM4 diagnosis impairing work status when the Claimant initially went off work in May of 2003. The documentation at that time lacked detailed documentation of neuro-vegetative depressive symptomatology, manic symptomatology or hypo-manic symptomatology consistent with a bipolar disorder. The documentation around that time included no mental status examinations. The diagnosis of bipolar disorder was given by the Family Practitioner and Infectious Disease Specialist. There was no indication of intensive individual psychotherapy consistent with an acutely impairing mood disorder around that time. The Claimant was started on Zyprexa which is a medication approved for psychosis and acute mania. Neither psychotic symptoms or acute manic symptoms were documented around this time.

(R. 91-92).

> Asked about the appropriateness of treatment, Dr. Becker responded:
>
> The treatment did not appear appropriate for a reportedly acutely impairing major mood disorder. This is based on lack of intensive individual therapy and lack of

14

>   appropriate psychiatric evaluation and followup around that time. The Claimant did start seeing a Psychotherapist in September 2003 but only on a monthly basis. The Therapist described that the treatment is generally supportive and for maintenance and the treatment does not include intensive individual cognitive behavioral or interpersonal psychotherapy typical for a severely impairing mood disorder.

(R. 92).

Dr. Rodgers, the pulmonologist, spoke with Dr. Bloxham, who had diagnosed Forrester's sleep apnea. He reported that Dr. Bloxham told him that Forrester had gotten CPAP treatment and was doing fine as far as the sleep apnea was concerned.

MetLife upheld the denial of benefits and so advised Forrester in a letter of May 28, 2004. The denial of the appeal considered the entire file, submitted both before and after the original decision, including:

- The report from rheumatologist Ernesto N. Levy, M.D., who examined Forrester and issued a report dated September 16, 2003, who found that Forrester suffered from fibromyalgia, depression, and sleep disorder.
- The October 8, 2003 letter from Dr. Garner to Dr. Schmidt, responding to some of Dr. Schmidt's conclusions and explaining in detail the basis for the diagnosis.
- The March 11, 2004 report from Dr. Garner discussing the diagnosis and treatment of Forrester.
- The March 24, 2004 letter from Dr. Garner to Forrester's attorney discussing the diagnosis and treatment of Forrester.
- The April 7, 2004 letter from David W. Simmonds, Ph.D., to Forrester's attorney, reporting his assessment that Forrester's psychiatric condition impaired her ability to function appropriately in full-time employment.
- The May 23, 2004 report by Mark R. Burns, M.D., the consultant engaged by MetLife.
- The April 28, 2004 report from MetLife's consultant, Lee H. Becker, M.D., concluding that the treatment Forrester received was inappropriate. The latest information Dr. Becker had was a phone call he made to Dr. Simmonds and April 7 letter by Dr. Simmonds.

- A May 5, 2004 report from MetLife's consultant J. W. Rodgers, M.D., stating that Forrester's condition was stable and asymptomatic of obstructive sleep apnea in February.

After reviewing the medical information considered and the reports of the Independent Physician Consultants, and noting the lack of documentation of a condition that would restrict Forrester's ability to work, the letter stated in part:

> We have reviewed all of the information which was submitted to be considered as part of the review of the disallow decision. Furthermore, all of the medical documentation that was detailed in MetLife's denial letter of September 8, 2003 was reviewed and is incorporated herein by reference. Upon review of this information along with the results of the Independent Physician Consultant reviews, it is our determination the information does not support your inability to perform your job for the time period in question beginning May 7, 2003. We continue to lack any information noting a clear physical or mental impairment that would support your inability to perform the essential elements of your own occupation as of May 7, 2003. Therefore, we have no alternative but to uphold the disallowance of your claim.

(R. 77).

On June 24, 2004, MetLife provided an administrative record to Forrester's attorney. Forrester filed this action on June 29, 2004.

**Conclusions of Law**

The Plan gives MetLife, as a claims fiduciary, discretionary authority to make determinations as to claims under the Plan. Accordingly, MetLife's decisions as to such claims, including the claims of the plaintiff, are subject to reversal by this court only if they were arbitrary and capricious. That is, the decision of MetLife must be upheld if there is substantial evidence supporting the decision. *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1005-06 (10th Cir. 2004). "Substantial evidence" is evidence which could be accepted by a reasonable person as adequate to a decision; it is "'more than a scintilla but less than a preponderance.'" *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F2d 377, 382 (10th Cir. 1992) (*quoting Flint v. Sullivan*, 951 F.2d 264, 266 (10th Cir. 1991)).

Substantial evidence supports the decision of MetLife in the present action. Forrester's job was sendentary clerical and office work which did not require physcial stress. Dr. Scmidt noted the

absence of lab reports, rheumatology reports or sleep studies confirming any disability. Instead, Forrester had merely been receiving the standard treatment for fibromyalgia, low dose antidepressants and exercise. Dr. Schmidt reviewed the additional information supplied by Drs. Levy and Gardner in the late fall of 2004, but reaffirmed her earlier opinion.

Forrester's mental status exam was within normal limits. (R. 289-291). Dr. Kilburn specifically found that plaintiff's mood symptoms were "clearly secondary, not really limiting her function, although her chronic fatigue syndrome aggravates her depressive mood swings." (R. 196). Forrester's mood swings were successfully treated with low-dose Zyprexa

After Forrester's appeal, MetLife arranged for a review of its denial by a rheumatologist, a board-certified physician in internal medicine, and a psychiatrist. The rheumatologist found that Forrester was not prevented from doing sedentary work in an office environment. The board-certified physician in internal medicine found that Forrester's sleep apnea was not disabling. And the psychiatrist found no history of psychiatric diagnosis impairing Forrester's work status, and that she was not receiving the type of treatment that would be appropriate had she in fact had a serious mood disorder impairment.

MetLife was not required to give deference to Forrester's treating physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). Its submission of Forrester's claim to independent experts reflects a thorough investigation. *See Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1005-06 (10th Cir. 2004). Because the opinions of the independent physician consultants supported MetLife's decision and the record as a whole demonstrates the presence of substantial evidence supporting that decision, the court finds that MetLife's decision was not arbitrary and capricious.

Plaintiff additionally argues that MetLife violated its obligations under ERISA when it failed, during the pendency of the appeal, to provide copies of all additional medical evidence it obtained prior to rendering a decision. Plaintiff's argument finds no support in the regulations issued by the Secretary of Labor, and this court is not free to impose such additional regulations where the

Secretary has not done so, *see Black & Decker Disability Plan v. Nord*, 538 U.S. at 831, and where indeed the result would be to confound the regulatory preference for fair but expeditious resolution to appeals.

No regulation promulgated by the Secretary authorizes such pre-decision disclosure. Instead, the regulations provide careful guidance as to when plan administrators must render their decisions. Under 29 C.F.R. §§ 2560.503-1(i)(1)(i), and 2560.503-1(i)(3)(i) the administrator must resolve any appeal of a denial of disability benefits within 45 days after the appeal is received, or within 90 days in cases involving special circumstances. MetLife complied with this requirement. ERISA generally requires a full and fair review of plan decisions.

> In accordance with the regulations of the Secretary, every employee benefit plan shall – (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a matter calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133 (ERISA § 503). Under 29 C.F.R. § 2560.503-1(h)(2)(iii), the administrator must provide "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." At the same time, the regulations require administrators considering an appeal from an adverse decision to consult with independent health care professionals. 29 C.F.R. § 2560.503-1(h)(3)(ii)(iii), (v).

MetLife complied with these regulations. The regulations necessarily raise the possibility that the independent health professional reviews will, as here, generate additional medical opinions and reports. The position of the plaintiff — that all such reports must be produced to a claimant prior to the resolution of the appeal — not only finds no support in the regulations themselves, it further raises the prospect of a continuing cycle of additional reports followed by rejoinders by the claimant followed by additional reports, and so is contrary to the regulatory scheme of 29 C.F.R. §§ 2560.503-1, which seeks to expeditious resolution of appeals. The court finds that 29 C.F.R. § 2560.503-1(j)(1), (3), requires only that copies of the relevant documents be made available in a

reasonable and timely fashion to the claimant, but does not require that such documents be produced prior to the resolution of the appeal.

The decision in *Metzger v. UNUM Life Ins. Co.*, No. 02-1321-MLB (D. Kan. March 22, 2004), which relied on *Sage v. Automation, Inc. Pension Plan & Trust*, 845 F.2d 885 (10th Cir. 1988), does not support a contrary result. *Sage* only addressed the failure of an administrator which had no written claim procedure at all, and held only that written documentation supporting the *initial* claim denial should be provided to the claimant. That documentation was supplied here. As discussed above, there is no obligation in the regulations or elsewhere for the proposition that the claimant essentially has a right to immediate production and right to rebuttal to additional medical records and opinions generated *after* the initial denial of claim and prior to any resolution of the appeal. The administrator satisfies its obligations under the regulations when it supplies all the documentation in a reasonable manner after the resolution of the appeal, so the claimant may form a reasonable judgment as to whether to commence a court action. Here, MetLife substantially complied with the regulations of the Secretary of Labor with respect to offering a reasonable opportunity for a full and fair review of the claims decision.

IT IS ACCORDINGLY ORDERED this 8th day of December, 2005, that the plaintiff's Motion for Summary Judgment (Dkt. No. 33) is denied; the defendant's Motion for Summary Judgment (Dkt. No. 35) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE